Jacobo **FINKIELSTAIN**, Plaintiff,

v.

**Julian M. SEIDEL, First Maryland Savings & Loan, Inc. and Maryland Deposit Insurance Fund Corp., as Receiver for First Maryland Savings & Loan, Inc., Defendants.**

No. 86 Civ. 8406 (PNL).

United States District Court,
S.D. New York.

Jan. 22, 1988.

---

Martha Solinger, Kronish, Lieb, Weiner & Hellman, New York City, John S. Mc Daniel, Cable, McDaniel, Bowie & Bond, Baltimore, Md., for plaintiff.

Joseph F. Donley, Adam B. Rowland, Shereff, Friedman, Hoffman & Goodman, New York City, Francis B. Burch, Sheila Mosmiller Vidmar, Piper & Marbury, Baltimore, Md., for defendants First Maryland Sav. & Loan and Maryland Deposit Ins. Fund.

## MEMORANDUM AND ORDER

LEVAL, District Judge.

This action is for rescission of the sale of a security under the federal securities laws and common law fraud. Defendants First Maryland Savings & Loan, Inc. ("First Maryland") and Maryland Deposit Insurance Fund Corporation ("MDIF") (collectively "defendants")[1] move to dismiss this action pursuant to Fed.R.Civ.P. 12(b)(1) contending that as an "arm" of the State of Maryland, MDIF is protected from suit in federal court under the Eleventh Amendment and that the action against First Maryland must be dismissed because MDIF is the real party in interest. In the alternative, defendants argue that this court ought to abstain from exercising its jurisdiction under either the *Burford* or the *Colorado River* abstention doctrine. Defendants also move to dismiss this action on the grounds of *forum non conveniens,* and or to transfer this action to the District of Maryland pursuant to 28 U.S.C. § 1404(a).

## BACKGROUND

This action concerns a two-phase transaction that occurred on October 31, 1983; in exchange for his note, defendant First Maryland loaned plaintiff Jacobo Finkielstain $1,000,000 which he used to purchase from First Maryland a $1,000,000 five-year subordinated debenture. The loan was offered to induce Finkielstain to purchase the debenture. The two instruments had almost identical repayment terms except that the interest paid by First Maryland on the debenture was two percent higher than that paid by Finkielstain to First Maryland on the promissory note. Finkielstain alleges that First Maryland and the defendant Sei-

---

1. The first named defendant, Julian M. Seidel has not joined in this motion. MDIF is named as a defendant in its capacity as receiver for First Maryland.

del, who was then the president, chairman and largest stockholder of First Maryland, induced him to enter the transaction by making numerous false and misleading representations and material omissions regarding First Maryland's financial condition.

In May 1985, in response to the growing crisis in the Maryland savings and loan industry, the Maryland General Assembly enacted special legislation. According to this statutory scheme, MDIF was established, as part of the State Department of Licensing and Regulation, to bring stability to, and restore confidence in Maryland's savings and loan industry. MDIF was charged with insuring the accounts of member associations, enabling member associations to qualify for federal insurance, and reimbursing savings account holders for losses. MDIF assumed the powers, duties and responsibilities of the Maryland Savings–Share Insurance Corporation ("MSSIC"), the state guarantee association that had previously insured many Maryland savings and loan associations including First Maryland. MSSIC was then dissolved. MDIF was also granted the right to be appointed conservator or receiver of any savings and loan association that it insured.

On November 20, 1985, MDIF sought to be, and was appointed conservator of First Maryland by Judge Kaplan of the Circuit Court of Montgomery County, upon a finding that First Maryland was in an impaired condition. First Maryland continued to operate in an impaired condition. In June 1986, MDIF was appointed receiver by Judge Kaplan.

Plaintiff alleges that as of June 19, 1986, the effective date of the receivership order, First Maryland ceased making payments of principal or interest on the subordinated debenture, that in August 1986 he stopped making payments on his note, and that in October 1986 First Maryland accelerated the payments due on the promissory note. Finkielstain has not made any payments on

the note since at least August 1986, and does not intend to make any payments. Complaint ¶¶ 34–35. On October 31, 1986, plaintiff filed this action alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (hereafter "Exchange Act") and Rule 10b–5 promulgated thereunder and of the principles of common law fraud, seeking rescission of the transaction, including cancellation of the promissory note and debenture.

On defendants' motions, I find that MDIF is protected by the State of Maryland's immunity under the Eleventh Amendment. As to First Maryland, I find on the facts of this action that it is not. I conclude finally that the court should not abstain, dismiss or transfer.

## DISCUSSION

### I. *Eleventh Amendment Immunity*

■ The Eleventh Amendment[2] principle of sovereign immunity is a constitutional limitation on the federal judicial power. *Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 98, 104 S.Ct. 900, 906, 79 L.Ed.2d 67 (1984). Unless a state consents "in unequivocal terms" to be sued in federal court, or unless Congress, "pursuant to a valid exercise of power, unequivocally expresses its intent to abrogate" a state's immunity, a state or an arm of the state may not be sued in federal court. *Green v. Mansour,* 474 U.S. 64, 106 S.Ct. 423, 425, 88 L.Ed.2d 371 (1985). There is authority that the immunity the Eleventh Amendment confers upon states themselves or on arms of the states does not depend upon the type of relief that is sought. *See Cory v. White,* 457 U.S. 85, 90, 102 S.Ct. 2325, 2328, 72 L.Ed.2d 694 (1982); *Alabama v. Pugh,* 438 U.S. 781 (1978); *Voisin's Oyster House, Inc. v. Guidry,* 799 F.2d 183, 186 (5th Cir.1986); *V.O. Motors, Inc. v. California State Bd. of Equalization,* 691 F.2d 871 (9th Cir.1982); *Richards v. State of New York, Appellate Division,* 597 F.Supp. 689 (E.D.N.Y.1984),

---

**2.** The Eleventh Amendment provides:
　The judicial power of the United States shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of

the United States by citizens of another State, or by Citizens or Subjects of any Foreign State. U.S. Const. Amend XI.

*aff'd mem.*, 767 F.2d 908 (2d Cir.1985). *But see Council of Commuter Organizations v. Metropolitan Transp. Auth.*, 683 F.2d 663 (2d Cir.1982) (Eleventh Amendment only bars suits for money damages against arms of the state). In contrast, a state official exercising a state function is cloaked with Eleventh Amendment immunity only "when the action is in essence one for recovery of money from the state." *Edelman v. Jordan*, 415 U.S. 651, 663, 94 S.Ct. 1347, 1356, 39 L.Ed.2d 662 (1974) (*quoting Ford Motor Co. v. Department of Treasury*, 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945)). I examine in turn MDIF's and First Maryland's claims of immunity under the Eleventh Amendment.

## A. MDIF

### 1. *Immunity*

Not all agencies that exercise a "slice of state power" come within the scope of the Eleventh Amendment. *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 401, 99 S.Ct. 1171, 1177, 59 L.Ed.2d 401 (1979); *see Matherson v. Long Island State Park Comm'n*, 442 F.2d 566 (2d Cir.1971). In particular, the Supreme Court has refused to extend Eleventh Amendment immunity to entities such as counties and municipal corporations even if they receive guidance and significant funding from the state. *See Mt. Healthy City School Dist. v. Doyle*, 429 U.S. 274, 280, 97 S.Ct. 568, 512, 50 L.Ed.2d 471 (1974); *Holley v. Lavine*, 605 F.2d 638 (2d Cir.1979), *cert. denied*, 446 U.S. 913, 100 S.Ct. 1843, 64 L.Ed.2d 266 (1980). Thus, in deciding whether MDIF is immune from suit in federal court, the court must determine whether it should be treated as an arm of the state or as one of those political entities, such as a municipal corporation, to which the Eleventh Amendment does not extend.

■ The determination whether a state agency shares the state's Eleventh Amendment shield rests on numerous factors. *See Trotman v. Palisades Interstate Park Comm'n*, 557 F.2d 35, 38 (2d Cir.1977); *Fitzpatrick v. Bitzer*, 519 F.2d 559, 564 (2d Cir.1975), *modified*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). The most important factor is "the nature of the entity created by state law." *Mt. Healthy*, 429 U.S. at 280, 97 S.Ct. at 572. Because the intention of the state to extend its Eleventh Amendment immunity to the agency is relevant to the court's determination, *see Lake Country Estates v. Tahoe Planning Agency*, 440 U.S. 391, 400–01, 99 S.Ct. 1171, 1176–77, 59 L.Ed.2d 401 (1979), the court must look to such factors as the definition of the entity, the state's degree of control over the entity, and the fiscal autonomy of the entity. *See Clark v. Tarrant County*, 798 F.2d 736 (5th Cir.1986); *Fouche v. Jekyll Island–State Park Auth.*, 713 F.2d 1518 (11th Cir.1983); *Holley v. Lavine*, 605 F.2d 638 (2d Cir.1979), *cert. denied*, 446 U.S. 913, 100 S.Ct. 1843, 64 L.Ed.2d 266 (1980). Where the state has "structured the agency to enable it to enjoy the special constitutional protection of the State[ ]," that intention will be accorded respect. *See Council of Commuter Organizations v. Metropolitan Transp. Auth.*, 683 F.2d 663, 672 (2d Cir.1982).

■ Applying these standards, three federal courts have determined that MDIF is an arm of the state. *See Second National Building & Loan, Inc. v. State of Maryland*, Civ. No. R–86–934 (D.Md.1986), *aff'd mem.*, 812 F.2d 1401 (4th Cir.1987); *American Casualty Co. v. Community Savings & Loan*, 635 F.Supp. 539 (D.Md.1986); *Community Savings & Loan, Inc. v. Citibank, N.A.*, Civ. No. M–85–4005 (D.Md. Oct. 10, 1985). I see no reason to find otherwise.

The State of Maryland exercises a high degree of control over MDIF. Its director is appointed by the Governor, and exercises power and performs duties subject to the authority of the Secretary of Licensing and Regulation. Md.Fin.Inst.Code Ann. §§ 10–103(a), (b); 10–105. Its Board of Directors is composed of nine members, three appointed by member associations with the approval of the Secretary of Licensing and Regulation and six appointed by the Governor. Md.Fin.Inst.Code Ann. § 10–103.

State statutes also view MDIF as an arm of the state. *See Voisin's Oyster House, Inc. v. Guidry,* 799 F.2d 183, 186 (5th Cir. 1986) (stressing importance of state statutes and case law). MDIF is formally a state agency. It is part of the Department of Licensing and Regulation, *see* Md.Fin. Inst.Code Ann. § 10–102, which is one of the principal departments of the executive branch of Maryland state government. Md.Code Ann. art. 41, §§ 221, 221A; Md. State Gov't Code Ann. § 8–201(b)(8). In creating MDIF, the Maryland General Assembly clearly expressed its intention that MDIF would be protected by the state's sovereign immunity: "Notwithstanding any other provision of law, and except as otherwise expressly provided in this section ... [MDIF] retains and may raise the defense of sovereign immunity in any action." Md.Fin.Inst.Code Ann. § 10–121.

These factors alone weigh heavily in favor of MDIF's Eleventh Amendment immunity. In *Council of Commuter Organization v. Metropolitan Transp. Auth.,* 683 F.2d 663 (2d Cir.1982), the court of appeals held that the Tri–State Regional Planning Commission was immune from suit in federal court on the basis of the statement in its enabling legislation that the Commission "enjoy[ed] the sovereign immunity of the party states and may not be sued in any court or tribunal whatsoever." *Id.* at 672. *See also Darryl H. v. Coler,* 801 F.2d 893, 906 (7th Cir.1986) (extending immunity to state agency because established by state statute and funded by the state).

Entitlement to Eleventh Amendment immunity is not solely a matter of state designation. *See Fitzpatrick v. Bitzer,* 519 F.2d 559, 565 n. 9 (2d Cir.1975) (determination of Eleventh Amendment immunity is a matter of federal law), *modified,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Other factors also indicate that MDIF be treated as an arm of the state. MDIF was created in the wake of a statewide crisis in the savings and loan industry. *See Chevy Chase Savings & Loan, Inc. v. State of Maryland,* 306 Md. 384, 509 A.2d 670, 674 (1986). It is a successor organization to the MSSIC which was created in 1962 and charged with regulating what the legisla-

ture then described as an industry "affected with a public interest and ... affecting the economic security and general welfare of the people of this State." Op.Md.Atty. Gen. 79, 82 (Oct. 15, 1985) (*quoting* Former Article 23, § 161A(a)). MDIF was thus created to deal with statewide problems of broad concern to the State.

Moreover, it appears that at least some of MDIF's funding will come from general revenue of the State of Maryland. *See Fitzpatrick v. Bitzer,* 519 F.2d 559, 565 (2d Cir.1975), *modified,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976); *Clark v. Tarrant County,* 798 F.2d 736, 744 (5th Cir. 1986). Plaintiff emphasizes provisions in the Maryland Financial Institution Code that treat state appropriations as advances rather than grants, Md.Fin.Inst.Code Ann. § 10–110.2, and that require MDIF to pay the state back for its appropriations out of recoveries it makes as insurer or subrogee. Md.Fin.Inst.Code Ann. § 10–120(b)(3). These provisions, however, are designed essentially to protect state funds from attachment by creditors of MDIF or its insureds. Other provisions of the Maryland Financial Code indicate that it is likely that the State Treasury will ultimately be responsible for funds paid by MDIF to depositors of its members.

It is the policy of the State of Maryland "that funds will be appropriated to the Fund to the extent necessary to protect holders of savings accounts in member associations, and to enable the Fund to meet its obligations under a hardship withdrawal plan or partial distribution of assets." Md. Fin.Inst.Code Ann. § 10–116. Although this obligation is not legally enforceable, "[i]t is part of the law of Maryland and is an affirmative expression of the General Assembly's intention to appropriate funds necessary to protect savings and loan association depositors." Op.Md.Atty.Gen. 79, 100 (Oct. 15, 1983). This distinguishes *Bowen v. Hackett,* 387 F.Supp. 1212 (D.R.I. 1975), where the legislature had simply established an administrative apparatus for the director of an unemployment insurance fund to inform the governor and general

assembly of the fund's need for state monies.

There are factors that weigh against MDIF being an arm of the state for purposes of the Eleventh Amendment. It has the capacity to sue and be sued and to enter into contracts on its own behalf, which indicates that MDIF has some degree of autonomy from the state. However, those factors have not traditionally been dispositive and are not controlling where outweighed by other factors indicating that MDIF is an arm of the state. *See Voisin's Oyster House, Inc. v. Guidry,* 799 F.2d 183, 187 (5th Cir.1986).

### 2. *Waiver or Abrogation*

The determination that MDIF may invoke the Eleventh Amendment's protection from suit in federal court does not end the analysis. The Supreme Court has held that a state may be sued in federal court when it consents to suit "in unequivocal terms" or when "Congress, pursuant to a valid exercise of power, unequivocally expresses its intent to abrogate the immunity." *Green v. Mansour,* 474 U.S. 64, 106 S.Ct. 423, 425, 88 L.Ed.2d 371 (1985). Thus, if Maryland has consented to suit in federal court or if Congress has abrogated the state's Eleventh Amendment immunity, this suit must be allowed to proceed against MDIF.

■ Plaintiff does not and cannot successfully contend that in establishing MDIF the State of Maryland has waived the defendants' sovereign immunity to suit by private citizens in federal court. The Supreme Court has held that waiver of a state's Eleventh Amendment immunity will be found "only where stated 'by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction.'" *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1361, 39 L.Ed.2d 662 (1974) (*quoting Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909)). Although the State of Maryland has waived MDIF's immunity to suit for insurance claims on savings and loan accounts that are brought in

the Maryland state courts, this hardly evinces "the state's intention to subject itself to suit in *federal court,*" *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 3147, 87 L.Ed.2d 171 (1985) (emphasis in the original), necessary for an effective waiver of Eleventh Amendment immunity. *See Kennecott Copper Corp. v. State Tax Comm.,* 327 U.S. 573, 577, 66 S.Ct. 745, 747, 90 L.Ed. 862 (1946); *Skehan v. Board of Trustees of Bloomsburg,* 669 F.2d 142, 148 (3d Cir.1982) (absent clear declaration of a state's consent to suit in federal court, such consent should not be inferred), *cert. denied,* 459 U.S. 1048, 103 S.Ct. 468, 74 L.Ed.2d 617 (1982).

■ Plaintiff does contend, however, that Congress has abrogated Eleventh Amendment immunity for claims under the Exchange Act. He relies first on *Forman v. Community Services, Inc.,* 500 F.2d 1246 (2d Cir.1974), *rev'd on other grounds sub nom. United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). In *Forman,* the Second Circuit held that the State of New York, acting in a proprietary capacity, had waived its Eleventh Amendment immunity "with respect to federal securities laws violations by voluntarily entering a field under federal regulation." *Id.* at 1256. The *Forman* Court decided that "by enacting the federal securities laws in the exercise of the Commerce Clause ... Congress conditioned the right to be involved in the sale and distribution of securities upon amenability to suit in federal court...." *Id.* at 1256.

The authority of *Forman,* however, was undercut almost as soon as it was decided. The case *Forman* relied on for the proposition that abrogation need not be express, *Parden v. Terminal Railway of Alabama Docks Dept.,* 377 U.S. 184, 192, 84 S.Ct. 1207, 1212, 12 L.Ed.2d 233 (1964), was sharply limited by *Employees of the Department of Public Health and Welfare v. Department of Public Health & Welfare,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973), where the Court rejected the argument that Congress had silently subjected the states to suit under the Federal Fair

Labor Standards Act. In the aftermath of *Employees,* the two circuits which passed on the issue after *Forman* both held that suits against states under the Exchange Act were barred by the Eleventh Amendment. *See Green v. State of Utah,* 539 F.2d 1266 (10th Cir.1976); *Brown v. Commonwealth of Kentucky,* 513 F.2d 333 (6th Cir.), *cert. denied,* 423 U.S. 839, 96 S.Ct. 70, 46 L.Ed.2d 59 (1975); *Yeomans v. Commonwealth of Kentucky,* 514 F.2d 993 (6th Cir.1975), *cert. denied,* 423 U.S. 983, 96 S.Ct. 404, 46 L.Ed.2d 309 (1975).

Last term, in *Welch v. State Dept. of Highways & Public Transp.,* —— U.S. ——, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987), five Justices of the Supreme Court voted to overrule *Parden v. Terminal Railways. See id.* at 2948 (1987) (plurality op. of Powell, J.); *id.* at 2958 (Scalia, J., concurring). In light of the Supreme Court's decision in *Welch,* I do not consider *Forman* to be controlling authority.

Since *Forman,* the Court has made clear that abrogation of a state's Eleventh Amendment immunity will not be found unless Congress expressly subjects the states to private suits.[3] *See Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1360, 39 L.Ed.2d 662 (1974). In *Employees of the Department of Public Health & Welfare v. Department of Public Health & Welfare,* 411 U.S. 279, 93 S.Ct. 1614, 36 L.Ed.2d 251 (1973), the Supreme Court held that the Fair Labor Standards Act did not abrogate the states' Eleventh Amendment immunity despite the fact that the provision of the Act exempting states from coverage had been amended to exclude state employers of hospital, institution or school workers from the exemption. The statute did not "by clear language [indicate] that the constitutional immunity was swept away." *Id.* at 285, 93 S.Ct. at 1618. The Court rejected petitioner's suggestion that the disallowance of suits by state employees would render the amendment meaningless; the Secretary of Labor was elsewhere given authority to bring action against employers covered under the Act, including state employers added by the amendment. *Id.* at 285, 93 S.Ct. at 1618.

In *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985), the Court held that Congress had not abrogated the immunity of the states in Section 504 of the Rehabilitation Act. The Court found that "Congress may abrogate the States' constitutionally secured immunity from suit in federal court only by making its intention unmistakably clear in the language of the statute," *id.* at 3147, and that the language of the statute subjecting "any recipient of Federal assistance" to liability for violations of Section 504 was sufficiently ambiguous to preclude a private action against a state. *Id.* at 3149. The Court added the admonition that courts "be certain of Congress' intent before finding that federal law overrides the guarantees of the Eleventh Amendment." *Id.* at 3148.

Most recently, in *Welch v. State Department of Highways and Public Transportation,* —— U.S. ——, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987), the Court overruled its earlier decision in *Parden* that states were liable under the Federal Employer's Liability Act. As Justice Brennan noted in dissent, *Parden* had been decided thirteen years earlier and thus even if the theory of constructive consent upon which *Parden* was based was erroneous, normal principles of statutory construction compelled the conclusion that FELA applied to the states. *See id.* at 2968 (Brennan, J., dissenting). The Court reiterated that Congress must express its intention to abrogate the immunity "in unmistakable statutory language." *Id.* at 2947. On the facts in *Welch,* where the Jones Act simply extended to "any seaman who shall suffer personal injury in the course of his employment," the Court held that Congress had not abrogated the states' Eleventh Amendment immunity.

Plaintiff contends that, since *Forman,* Congress has expressed its intent to sub-

---

**3.** Indeed, it remains an open question whether Congress may abrogate the immunity of the states under its commerce clause power. *See*

*Welch v. State Dept. of Highways & Public Transp.,* —— U.S. ——, 107 S.Ct. 2941, 2946, 97 L.Ed.2d 389 (1987).

ject the states to suit under the Exchange Act. In 1975, Congress amended Section 78c(a)(9) of the Exchange Act to include a "government, or political subdivision, agency, or instrumentality of a government" in the definition of "person" under the Act. Section 10(b) and Rule 10b–5 promulgated thereunder, make it unlawful for "any person" to engage in fraud in the sale or purchase of "any security." Section 78c(a)(9) read in conjunction with Section 10(b) thus might be understood to subject states to liability for fraudulent practices in the sale or purchase of a security.

I conclude, however, that congressional intent is sufficiently ambiguous as to whether a private cause of action exists against a state. Initially, I note that neither Section 10(b) nor Section 78c(a)(9) purport to subject a state to suit by a private person for a fraudulent practice. The private right of action under Section 10(b) is implied. *See Superintendent of Insurance v. Banking Life & Casualty Co.*, 404 U.S. 6, 13 n. 9, 92 S.Ct. 165, 169 n. 9, 30 L.Ed.2d 128 (1971). In contrast, the Securities and Exchange Commission has an express right to bring a civil action against a person who has violated Section 10(b) and has authority to refer a criminal action to the United States Attorney, 15 U.S.C. § 78u(d). It could well be that the amendments to § 78c(a)(9) contemplate only actions brought by the Federal Government against a state, which are not barred by the Eleventh Amendment. Alternatively, the amendment referring to government agencies and instrumentalities could have been intended to refer to municipal issuers who do not enjoy immunity. I conclude there is no clear expression of congressional intent to abrogate immunity. *See Employees of the Department of Public Health & Welfare v. Department of Public Health & Welfare*, 411 U.S. 279, 285–86, 93 S.Ct. 1614, 1618–19, 36 L.Ed.2d 251 (1973) (reading inclusion of state employers in FLSA to allow only injunction actions by Secretary of Labor); Note, *Disclosure by Issuers of Municipal Securities: An Analysis of Recent Proposals and a Suggested Approach*, 29 Vand.L.Rev. 1017, 1052 (1976) ("The 1975 amendment of the definition of 'person' under the 1934 Act to include a government or political subdivision, agency, or instrumentality of government does not by itself constitute clear indication of congressional intent to subject states to actions in federal courts for violations of the antifraud provisions. Moreover, the provisions for SEC actions against a state for violations of the securities laws militate against a private cause of action against a state.").

Nor does the legislative history of the Securities Acts Amendments of 1975 evidence any clear intention to abrogate the state's Eleventh Amendment immunity. The Securities Acts Amendments of 1975 were provoked by congressional desire to subject the "brokers and dealers and banks engaged in a municipal securities business" to federal regulation. S.Rep. No. 94–75, 94th Cong., 1st Sess. 3, *reprinted in* 1975 U.S.Code Cong. & Admin.News 179, 182. *See In re New York City Municipal Securities Litigation*, 507 F.Supp. 169, 183–85 (S.D.N.Y.1980) ("Although Congress sought to establish a regulatory scheme for the municipal securities market by the adoption of the 1975 amendments, what Commissioner Landis referred to as obvious political reasons again led Congress to regulate municipal securities dealers but to exempt the municipalities themselves."). In light of a reported increase in the amount of fraud in the municipal securities trading industry, Congress intended to subject broker-dealers to liability for "unconscionable markups, churning of customers' accounts, misrepresentations concerning the nature and value of municipal securities, disregard of suitability standards, and scandalous high-pressure sales techniques." *Id.* at 43, 1975 U.S.Code Cong. & Admin.News at 221. Congress, however, was "mindful of the historical relationship between the federal securities laws and issuers of municipal securities," *id.* at 44, 1975 U.S.Code Cong. & Admin.News at 221, and the reports accompanying the legislation evince no intention to subject the states to liability under Section 10(b).

In the wake of the Supreme Court's decisions in *Atascadero, Employees,* and

*Welch,* it cannot be said that Congress has abrogated the immunity of MDIF "by the most express language or by such overwhelming implications from the text as [will] leave no room for any other reasonable construction." *Edelman v. Jordan,* 415 U.S. 651, 673, 94 S.Ct. 1347, 1361, 39 L.Ed.2d 662 (1974) (quoting *Murray v. Wilson Distilling Co.,* 213 U.S. 151, 171, 29 S.Ct. 458, 464, 53 L.Ed. 742 (1909)). The action against MDIF is therefore barred by the Eleventh Amendment and must be dismissed for lack of subject matter jurisdiction.

**B. First Maryland**

■ The question whether First Maryland is immune from suit in federal court under the Eleventh Amendment is governed by different considerations from those applicable to MDIF. First Maryland is a commercial banking organization, not an arm or agency of the state. This does not necessarily answer the question definitively, because immunity is sometimes found when the state, though not a named defendant, is the real party in interest. *See, e.g., Green v. Mansour,* 474 U.S. 64, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985). In particular, immunity has been found in actions brought against persons who are state officials "when the action is in essence one for the recovery of money from the state." *Edelman v. Jordan,* 415 U.S. 651, 663, 94 S.Ct. 1347, 1355, 39 L.Ed.2d 662 (1974) (*quoting Ford Motor Co. v. Department of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 350, 89 L.Ed. 389 (1945)).

■ By this action, however, plaintiff does not seek to recover money from the state. In fact, the action does not seek to recover money at all. What plaintiff seeks is the rescission of his transaction with First Maryland, voiding both the note owed by him to First Maryland and the debenture owed by First Maryland to him. Thus, if plaintiff wins his suit, First Maryland will be prevented from collecting the outstanding balance of plaintiff's note.

I recognize that plaintiff's action against First Maryland may ultimately have an effect on the Maryland State Treasury. If First Maryland loses the right to collect plaintiff's note, First Maryland will have less money to use to satisfy the claims of depositors. Since the state has undertaken through MDIF to protect the "holders of savings accounts," Md.Fin.Inst.Code Ann. § 10–116, a reduction in First Maryland's collectible assets may ultimately require the state to utilize more of its funds to satisfy depositors.[4] But the relationship between Finkielstain's suit against First Maryland and the state treasury is both contingent and indirect. If in the end First Maryland's assets prove sufficient to satisfy its depositors, the cancellation of Finkielstain's note will have no effect on the state treasury. If First Maryland's assets are insufficient, then its failure to collect plaintiff's note will affect the state treasury, but only indirectly. Because of its obligation to account holders to make up the insufficiency of First Maryland's assets, the state will need to put up additional funds. But under no circumstances will it be required to pay out state funds to Finkielstain.

The mere fact that an action against a private party may indirectly cause financial consequences for a state treasury does not invoke Eleventh Amendment immunity for that private party. *See Quern v. Jordan,* 440 U.S. 332, 347, 99 S.Ct. 1139, 1148, 59 L.Ed.2d 358 (1979). Federal courts have permitted suits against state insurance commissioners notwithstanding the likelihood that judgments in plaintiffs' favor might be paid eventually with state money. *See Excess & Casualty Reinsurance Corp. v. Insurance Comm'r of the State of California,* 656 F.2d 491, 497 (9th Cir.1981). Also suits have been maintained in federal courts against state officers even where the state government has agreed to indemnify the liability so that it will ultimately pay the judgment. *See, e.g., Duckworth v. Franzen,* 780 F.2d 645 (7th Cir.1985), *cert.*

---

**4.** Under Maryland law, MDIF does not have an obligation to assume receivership of First Mary-

land. *See* Md.Fin.Inst.Code Ann. § 9–709.

denied, 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed. 2d 28 (1986); *Wilson v. Beebe,* 770 F.2d 578 (6th Cir.1985) (*en banc*); *Demery v. Kupperman,* 735 F.2d 1139 (9th Cir.1984), *cert. denied,* 469 U.S. 1127, 105 S.Ct. 810, 83 L.Ed.2d 803 (1985); *Broome v. Percy,* 470 F.Supp. 633 (E.D.Wisc.1979).

There are many circumstances in which a suit against a private entity may affect the state treasury. If the defendant is insolvent and the state is its sole creditor, a suit to void the plaintiff's liability to the defendant will diminish the state's recovery, dollar for dollar. It does not, however, implicate the Eleventh Amendment for that reason.

Nor is the Eleventh Amendment implicated merely because MDIF, an arm of the state, has been appointed receiver of First Maryland. As noted in the preceding section, an action brought against MDIF invokes the state's immunity. It does not follow that immunity results for suits against any entity for which MDIF acts as receiver.

The motion to dismiss the action against First Maryland on Eleventh Amendment grounds is denied.[5]

## II. *Abstention*

■ Defendants next contend that the Court should abstain from adjudication of this case for the reasons set forth in *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943), and *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976). "[A]bstention from the exercise of federal jurisdiction is the exception, not the rule." *Colorado River Water Conserv. Dist.,* 424 U.S. at 813, 96 S.Ct. at 1244. I find that abstention is not appropriate here.

*Burford* abstention is appropriate where federal review of a state agency's development of regulatory policy would lead to "[c]onflicts in the interpretation of state law" and the state courts can give full relief. *Burford v. Sun Oil Co.,* 319 U.S. 315, 334, 63 S.Ct. 1098, 1107, 87 L.Ed. 1424 (1943). In such circumstances, the benefit to a private party of a federal forum is outweighed by the cost of dual federal-state review of agency action.

Defendants argue that MDIF stands in the posture of an agency whose development of policy is being challenged. As defendants argue in their brief, Maryland has established a complex scheme for the liquidation of savings and loan institutions which would be impaired by the presence of unresolved lawsuits around the country. Thus, defendants contend, review of MDIF's administration of First Maryland should be analogized to the review of actions of the New York State Superintendent of Insurance as Liquidator for a private insurance company from which the federal courts must abstain under *Burford* abstention. *See Law Enforcement Insur. Co. v. Corcoran,* 807 F.2d 38 (2d Cir.1986), *cert. denied,* ── U.S. ──, 107 S.Ct. 1896, 95 L.Ed.2d 503 (1987); *Levy v. Lewis,* 635 F.2d 960 (2d Cir.1980).

Defendants misconceive the basis of *Burford* abstention. "[T]he mere potential for conflict in the results of adjudications, does not, without more, warrant staying exercise of federal jurisdiction" under *Burford* abstention. *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 816, 96 S.Ct. 1236, 1245, 47 L.Ed. 2d 483 (1976); *see Arkwright–Boston Mfrs. Mutual Insur. Co. v. City of New York,* 762 F.2d 205, 209 (2d Cir.1985). *Burford* abstention is addressed to the potential for federal interference with the development of state *policy* and is justified only where "the issues sought to be adjudicated in federal court [are] largely ones of state

---

5. The cases which defendant cites for the proposition that the private party is immune whenever the state is the real party in interest are not to the contrary. *Navarro Savings Ass'n v. Lee,* 446 U.S. 458, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980), *Bullard v. City of Cisco,* 290 U.S. 179, 54 S.Ct. 177, 78 L.Ed. 254 (1933), and *Sadler v. New Hanover Mem. Hosp, Inc.,* 588 F.2d 914 (4th Cir.1978), all concern the determination of the real party in interest for the purposes of diversity jurisdiction. To the extent that *American Casualty Co. v. Community Savings & Loan, Inc.,* 635 F.Supp. 539 (D.Md.1986), may be read to reach a different result than I do, I do not find its analysis convincing.

law." *Law Enforcement Insur. Co. v. Corcoran,* 807 F.2d 38, 43 (2d Cir.1986).

This case is unlike *Corcoran* and *Levy* where the Second Circuit found *Burford* abstention appropriate. There, plaintiffs attempted to challenge the authority of the State Superintendent of Insurance to adjust the claims of policyholders, employees and general creditors, pursuant to a "complex administrative and judicial system for ... liquidating domestic insurance companies." *Levy v. Lewis,* 635 F.2d at 963. Federal review of the administration of the liquidation "create[d] a potential for piecemeal review, for continual interruption of liquidation proceedings, and for unequal treatment of liquidation claimants." *Id.* at 964. Here, by contrast, Finkielstain has alleged that in a single isolated instance in negotiating the sale of a debenture, First Maryland made fraudulent representations. The subject of Finkielstain's cause of action does not implicate state policy and a decision in his favor would only indirectly affect the state. As in *Stoller v. Baldwin–United Corp.,* [1984] Sec.L.Rep. ¶ 91,678, at 99,430 (S.D.Oh.1984) [available on WESTLAW, 1984 WL 828], "any disruptive effect this action may have on [the state] proceeding will in no way inhibit [Maryland's] ability to fashion a general 'coherent policy.' "

In addition, *Burford* abstention is inappropriate because the claims that Finkelstain asserts, under the Exchange Act, are not largely ones of state law. They are claims that are subject to the *exclusive* jurisdiction of the federal courts. Rather than avoiding interference with state policy, abstention in these circumstances would allow Maryland to overcome federal law or policy merely by entering an order of receivership. *Burford* abstention does not require, or even allow, such a result. *See Levy v. Lewis,* 635 F.2d 960 (2d Cir.1980) (abstention inappropriate where claim is within exclusive jurisdiction of federal courts); *Stoller v. Baldwin–United Corp.,* (1984) Fed.Sec.L.Rep. ¶ 91,678 (S.D.Oh. 1984) (same); *accord Law Enforcement Insur. Co. v. Corcoran,* 807 F.2d 38, 44 (2d Cir.1986) (abstention permissible where "case presents no issues of federal law").

For much the same reason, abstention under *Colorado River* is also inappropriate. *Colorado River* was a case in which a federal statute, the McCarran Amendment, evinced a "clear federal policy [in] the avoidance of piecemeal adjudication of water rights in a river system." *Colorado River Water Conserv. Dist. v. United States,* 424 U.S. 800, 819, 96 S.Ct. 1236, 1247, 47 L.Ed.2d 483 (1976); *see Levy v. Lewis,* 635 F.2d at 966 (finding similar federal policy in McCarran–Ferguson Act). The interests of "wise judicial administration" thus justified deviation from the rule that "the pendency of an action in the state court is no bar to proceedings concerning the same matter in the Federal court having jurisdiction." *Colorado River Water Conserv. Dist.,* 424 U.S. at 817, 96 S.Ct. at 1246. Where the "misfortune" of piecemeal litigation is not "the result of any choice between the federal and state courts," the case therefore does not fall within the "exceptional circumstances" that justify *Colorado River* abstention. *Moses H. Cone Memorial Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 20, 103 S.Ct. 927, 939, 74 L.Ed.2d 765 (1983).

In particular, courts have uniformly held that a federal court should not refrain under *Colorado River* abstention from hearing a case within the exclusive federal jurisdiction. *See Andrea Theatres, Inc. v. Theatre Confections, Inc.,* 787 F.2d 59, 62 (2d Cir.1986); *Levy v. Lewis,* 635 F.2d 960 (2d Cir.1980); *Lyons v. Westinghouse Electric Corp.,* 222 F.2d 184 (2d Cir.), *cert. denied,* 350 U.S. 825, 76 S.Ct. 52, 100 L.Ed. 737 (1955); *Stoller v. Baldwin–United Corp.,* [1984] Fed.Sec.L.Rep. ¶ 91,678 (S.D. Oh.1984); *Certified Group, Inc. v. First Variable,* [1981–82] Fed.Sec.L.Rep. ¶ 98,242 (D.D.C.1981); *cf. Arizona v. San Carlos Apache Tribe,* 463 U.S. 545, 560, 103 S.Ct. 3201, 3210, 77 L.Ed.2d 837 (1983) (*Colorado River* abstention improper if "there was no jurisdiction in the concurrent state actions to adjudicate the claims at issue in the federal suits").

Defendants' argument that Finkielstain has a similar cause of action under Maryland law is unavailing. As Justice Brennan

explained in *Will v. Calvert Fire Insur. Co.*, 437 U.S. 655, 675–75, 98 S.Ct. 2552, 2563, 57 L.Ed.2d 504 (1978) (Brennan, J., dissenting), it is incumbent upon federal courts to adjudicate expeditiously claims within their exclusive jurisdiction regardless of any effect a state court judgment on a similar claim would have on the federal cause of action. Defendants' motion for abstention is denied.

### III. *Dismissal or Transfer*

Finally, defendants move to dismiss the action under the doctrine of *forum non conveniens* or to transfer the action to transfer the action to the United States District Court for the District of Maryland pursuant to 28 U.S.C. § 1404(a). The arguments for dismissal or transfer are without merit.

### A. *Forum Non Conveniens*

■ The doctrine of *forum non conveniens* permits a district court to dismiss an action where the balance of public and private interests outweighs the presumption in favor of the plaintiff's choice of forum. *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); *Manu International, S.A. v. Avon Prods., Inc.*, 641 F.2d 62, 64–65 (2d Cir.1981). Although a foreign plaintiff's choice of forum is entitled to slightly lesser deference than that of a citizen, *see Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 256, 102 S.Ct. 252, 266, 70 L.Ed.2d 419 (1981); *Overseas Nat'l Airways, Inc. v. Cargolux Airlines Int'l, S.A.*, 712 F.2d 11, 14 (2d Cir.1983), the burden is on the defendant to establish that the action should be dismissed, *see Maria Victoria Naviera, S.A. v. Cementos Del Valle*, 759 F.2d 1027, 1031 (2d Cir.1985).

■ The motion to dismiss is denied. Defendants argue that plaintiffs should be forced to bring their action in Maryland state court because MDIF and First Maryland and their officers all reside in Maryland, the receivership action is pending in Maryland, and MDIF and First Maryland's corporate documents are located in Maryland. Defendants, however, have not controverted plaintiff's claims that his business interests are located primarily in New

York, that the misrepresentations that constitute the gravamen of this action took place in New York, that he is not presently a party to any action pending in Maryland relating to the promissory note or debenture, and that two witnesses to the misrepresentations are located in New York. *See* Finkielstain Aff ¶¶ 2–10. Moreover, as plaintiff's Exchange Act claim is within the exclusive jurisdiction of the federal courts, it is clear that this Court and not the Maryland state court is most familiar with the law which is to be applied. *See Gulf Oil v. Gilbert*, 330 U.S. at 509, 67 S.Ct. at 843.

■ It is a rare case in which the courts will find dismissal on *forum non conveniens* appropriate on the grounds that a state court is the more convenient forum. *See* Wright, Miller & Cooper, Federal Practice & Procedure § 3828 (1986). Here, where the relevant events took place and the witnesses are located in New York, and the law to be applied is within the exclusive jurisdiction of the federal courts, the balance of public and private interest factors dictates that the action not be dismissed.

### B. Transfer

■ Under 28 U.S.C. § 1404(a), an action may be transferred to another judicial district for the convenience of parties and witnesses and in the interests of justice even where dismissal for *forum non conveniens* would not be appropriate. *See Norwood v. Kirkpatrick*, 349 U.S. 29, 75 S.Ct. 544, 99 L.Ed. 789 (1955). Defendants offer the same arguments for transfer as for dismissal. I find that they have not met their burden in showing why the action should be transferred. *See Factors Etc., Inc. v. Pro Arts, Inc.*, 579 F.2d 215 (2d Cir.1978), *cert. denied*, 440 U.S. 908, 99 S.Ct. 1215, 59 L.Ed.2d 455 (1979).

■ A transfer to the District Court for the District of Maryland would be to convenience defendants. However, plaintiff contends that his business interests are centered in New York. The result of a transfer would not be to convenience the "parties" but merely to shift the inconvenience from one party to the other. *See Darby*

*Drug Co. v. Zlotnick,* 573 F.Supp. 661, 664 (S.D.N.Y.1983).

Although it is true that the officers of First Maryland, as well as its documents, are in Maryland, Finkielstain and two of his business associates who witnessed his meetings with Seidel are in New York. Finkielstain Aff. ¶ 9.

The motion to transfer is denied.

### CONCLUSION

The motion to dismiss on Eleventh Amendment grounds is granted as to MDIF but denied as to First Maryland. The motion to abstain under *Burford* and *Colorado River* is denied. The motion to dismiss for *forum non conveniens* or to transfer the action to the United States District Court for the District of Maryland is denied.

SO ORDERED.